## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**MICHAEL EISCHEN,**

                **Plaintiff,**        **:**

      **v.**

                         **Case No. 2:21-cv-5837**
                         **Judge Sarah D. Morrison**
**ADAPTATION FINANCIAL**          **Magistrate Judge Elizabeth A.**
**ADVISERS INC.,** *et al.,*      **:**     **Preston Deavers**

              **Defendants.**

## OPINION AND ORDER

Michael Eischen filed this action against Adaptation Financial Advisers, Inc., APN Adaptation Financial Holdings LLC, and Alan Niemann (together, the "Adaptation Group") and Cambridge Investment Research, Inc. after Adaptation terminated his employment, allegedly on Cambridge's demand. (Am. Compl., ECF No. 8.) Adaptation then filed counterclaims against Mr. Eischen. (Countercl., ECF No. 16.) Mr. Eischen, the Adaptation Group, and Cambridge have each filed a Motion for Summary Judgment. (ECF Nos. 53, 54, 55.[1]) The parties came before the Court for oral argument on March 7, 2024. (*See* ECF No. 79.) The Motions are fully briefed and ripe for review.

---

[1] The Adaptation Group filed its Motion for Summary Judgment twice. The first (ECF No. 52) is filed without exhibits and is thus **DENIED as moot**.

## I. BACKGROUND

### A. Adaptation acquired Eischen Financial Group in August 2020. In connection with the transaction, Mr. Eischen signed an Employment Agreement.

Michael Eischen owned and operated Eischen Financial Group ("EFG"), an investment advisory firm, for roughly 20 years. (Eischen Decl., ECF No. 54-1, ¶ 3.) On December 30, 2019, Mr. Eischen entered into a Letter of Intent ("LOI") to sell EFG to Adaptation. (LOI, ECF No. 54-11.) Eight months later, on August 27, 2020, Mr. Eischen, EFG, and Adaptation signed an Asset Purchase Agreement ("APA") that effectuated the deal first proposed in the LOI. (APA, ECF No. 54-12.) Pursuant to the APA, Adaptation purchased certain of EFG's assets and assumed certain of EFG's liabilities, in exchange for $2 million and a $140,000 promissory note made out to EFG. (APA, § 1.5(a).) Mr. Eischen also received equity in Adaptation and a seat on Adaptation's Board, and agreed to work for two years as an Adaptation investment advisory representative and President of Adaptation's Ohio office. (*Id.*, §§ 9.3, 9.4, 9.8.) The employment relationship was memorialized in an Investment Adviser Representative and Employment Agreement. (Employment Agreement, ECF No. 54-2.)

The Employment Agreement contains the following relevant provisions:

> In the event that the Employment Period may terminate prior to the Scheduled Termination Date, the Date of Termination shall be determined in accordance with the following: . . . (iii) Without Good Cause by [Adaptation], as of the date stated in [Adaptation's] notice to [Mr. Eischen] but not less than ninety (90) days from the date of [Mr. Eischen's] receipt of [Adaptation's] notice. (iv) For Good Cause by [Adaptation], immediately upon providing written notice to [Mr. Eischen], except in the event of [an applicable] cure period. . . .

2

(*Id.*, § 8(a).) "Good Cause" includes,

> in the reasonable determination of the Board of Directors, . . . the commission by [Mr. Eischen] of an act or course of conduct constituting fraud or dishonesty, or actions or failures to act constituting gross negligence or willful neglect of duties [Mr. Eischen] in the performance of his duties or employment hereunder, if such action or failure is not cured within ten (10) days of written notice from the Board of Directors containing reasonable details concerning the nature of the action or failure . . . .

(*Id.*, § 1(f).) Depending on the nature of the termination, certain compensation may also come due. Upon termination for any reason, Adaptation must pay Mr. EIschen all amounts then-earned but not-yet-paid ("Accrued Obligations"). (*Id.*, § 8(b).) And on termination without Good Cause, Mr. Eischen was owed certain "Severance Payments." (*Id.*, § 8(c)(i).)

The Employment Agreement also contains post-termination restrictions and obligations. In brief, Section 9 discusses ownership and disclosure of information and Company property; Section 10 deals with use and disclosure of Confidential Information; and Section 11 contains non-solicitation and non-competition provisions. (*Id.*, §§ 9, 10, 11.)

**B.     EFG and Adaptation are Registered Investment Advisers. Mr. Eischen worked as an Investment Advisory Representative. Tim Woodburn worked as an Investment Advisory Representative and a Registered Representative.**

As of August 27, 2020, EFG had roughly 250 advisory clients and $300 million in assets under management. (Eischen Dec., ¶ 14.) At the time of the sale, Mr. Eischen worked for EFG as an Investment Advisory Representative ("IAR") and Tim Woodburn worked for EFG as a Registered Representative ("RR") and IAR.

3

The distinction between an IAR (associated with a Registered Investment Advisor) and an RR (associated with a Broker-Dealer) is important. Mr. Eischen's securities regulation expert Lisa Roth explains the difference as follows:

> Several laws govern the securities industry in the US. Primary among them are the US Securities and Exchange Act of 1934 (Exchange Act) and the Investment Advisers Act of 1940 ('40 Act).
>
> - The Exchange Act gives the US Securities and Exchange Commission (SEC) authority over all aspects of the securities industry including the registration of Broker-Dealers or BDs. Under the Exchange Act, the SEC delegated authority to the Financial Industry Regulatory Authority (FINRA) to create rules under which BDs must operate. FINRA is a self-regulatory organization (SRO) that operates as a separate corporation under the SEC, which is a federal government agency. The SEC and FINRA are distinct and separate entities charged with protecting investors. FINRA primarily regulates broker-dealers and their agents, while the SEC has broad authority over securities markets.
>
> - The '40 Act regulates firms that are compensated for advising others about securities investments and requires them to conform to SEC rules and regulations designed to protect investors. These firms are Investment Advisers or IAs.
>
> - The laws, rules and regulations that govern the two types of firms are separate and distinct.
>
> BDs and IAs are differentiated by the services and products they offer.
>
> - Generally, broker-dealers recommend securities and execute transactions for customers.
>
> - Investment advisers render advice about securities, the advisability of investing in securities, and manage portfolios.
>
> To a layperson, the differences may seem subtle, but they are nonetheless important because each entity is bound to comply with specific laws, rules and regulations.

(Roth Report, ECF No. 54-7, PAGEID # 3840–41.)

4

### C. Adaptation established a relationship with Cambridge immediately after acquiring EFG.

Just one day after the APA was executed, Adaptation signed an Independent Registered Investment Adviser Relationship Agreement ("IRIA Relationship Agreement") enlisting Cambridge to serve as the firm's new Broker-Dealer. (IRIA Relationship Agreement, ECF No. 55-2.) As an IAR, Mr. Eischen was not registered with, or directly supervised by, Cambridge—but as an RR, Mr. Woodburn was. Nonetheless, the IRIA Relationship Agreement gave Cambridge certain contractual rights and authority with respect to services offered by Adaptation's IARs. (*See, e.g.*, IRIA Relationship Agreement, § 2.*l.* ("Due to supervisory requirements outlined in FINRA Notice to Members 94-44 and Notice to Members 96-33 [Adaptation] understands and agrees that Cambridge may impose limits or restrictions regarding the investment advisory services, broker-dealers, custodians, and advisory platforms that investment advisor representatives of [Adaptation] may offer or utilize. [Adaptation] agrees to comply with such limits and restrictions and supervise it associated persons' compliance with such limits and restrictions including any State imposed restriction regarding unethical activity by investment advisor representatives.").)

### D. Cambridge conducted a for-cause audit of Adaptation's Ohio office in August 2021.

On August 3, 2021, Cambridge conducted an unannounced audit of Adaptation's Ohio office. The audit was "for-cause"—meaning, Cambridge "identified something [it had] concerns with." (Chabin Dep., ECF No. 51-6, 105:10–

5

12.) Elizabeth Chabin (the Cambridge principal responsible for the audit) testified that "the primary driving factor[s] for the for-cause audit" were:

- A suspicion that Mr. Eischen was personally engaged in selling variable annuities (which, as an IAR, he is not licensed to do);

- "[G]eneral compliance concerns," as Mr. Eischen failed to get Cambridge's approval on the office's marketing materials as required under the IRIA Relationship Agreement; and

- "[S]ignature irregularities" discovered on paperwork underlying sales made by Mr. Woodburn.

(*Id.*, 106:21–23.)

The audit, which included interviews with Messrs. Eischen and Woodburn, resulted in multiple compliance deficiency findings. (Audit Report, ECF No. 54-13; ECF No. 54-14.) The most relevant findings are summarized in Ms. Chabin's December 2021 notes. (Chabin Notes, ECF No. 54-15.) Ms. Chabin explained, "[t]here are five related concerns that overlap: variable annuity sales, signature irregularities, [Mr. Eischen's] role in the practice, undisclosed private securities transactions, [and a] general culture of non-compliance." (*Id.*, PAGEID # 4078). The audit findings as to each are summarized below:

- *Variable annuity sales*. Mr. Woodburn and another RR failed to submit certain paperwork to Cambridge.

- *Signature irregularities*. Mr. Woodburn regularly photocopied and re-used client signatures.

- *Mr. Eischen's role in the practice*. Ms. Chabin opined that Mr. Eischen may not have "acted in good faith" with respect to his status vis-à-vis Adaptation post-APA. She also noted that Mr. Eischen had difficult relationships with others in the Ohio office.

- *Undisclosed private securities transactions*. Mr. Eischen engaged in three transactions outside of Cambridge. Though these transactions were

6

ultimately cleared as personal investments (e.g., not investments made for or on behalf of clients), they are noted on the audit report as compliance deficiencies.

- _General culture of non-compliance_. "The audit findings address a number of simple, required [Cambridge] rules that were disregarded. Everything from correspondence issues, website items, basic advertising approval, [outside business activity] reporting, etc. were not maintained appropriately." (_Id._, PAGEID # 4081.)

Ms. Chabin traveled to Oklahoma City to discuss the audit findings with Adaptation CEO Alan Niemann on September 7, 2021. There are conflicting accounts of that meeting as it related to Mr. Eischen, specifically whether Ms. Chabin delivered an ultimatum from Cambridge that either Adaptation terminate Eischen and Woodburn, or Cambridge would terminate Adaptation. (_Compare id._, PAGEID # 4083 _and_ Niemann Dep., ECF No. 51-4, 88:21–91:3. See also Niemann Dep., 173:3–9.) Ms. Chabin denies issuing any type of ultimatum. (Chabin Dep., 150:14–151:13.) Mr. Niemann and Adaptation CFO Kacey Butcher testify that she did. (Niemann Dep., 90:8–14; Butcher Dep., ECF No. 51-3, 73:13–74:1.)

### E. Mr. Niemann terminated Mr. Eischen's employment with Adaptation on September 14, 2021.

Mr. Eischen flew to Oklahoma City for the September 14, 2021 Adaptation Board meeting. After the Board meeting, Mr. Eischen met with Mr. Niemann one-on-one. (Eischen Decl., ¶ 18.) "During this meeting, [Mr. Niemann] told [Mr. Eischen] that Cambridge's audit of [the] office had identified several serious issues, that [Mr. Woodburn] had forged client signatures, and that [they] would both be fired." (_Id._) Mr. Niemann offered to "present" the departure as a retirement. (_Id._) But Mr. Eischen was immediately denied access to his office. (_Id._, ¶ 19.) And

although Mr. Niemann later presented separation documents to Mr. Eischen, he

"cut off negotiations" on learning that Mr. Eischen asked counsel to review them.

(*Id.*)

### F. Mr. Eischen received a Notice of Termination on October 6, 2021.

The Adaptation Board met again on October 6, 2021. Afterwards, Mr.

Eischen received the following Notice of Termination:

> This written notice is provided in accordance with Section 8(a)(iv) of the Investment Adviser Representative and Employment Agreement between Adaptation Financial Advisors Inc., a Texas corporation ("Company") and Michael P. Eischen, dated August 27, 2020. You were notified in November 2020 that all TDA suitability paperwork needed to be completed and sent to Cambridge by February 2021. The TDA suitability paperwork has still not been completed despite multiple requests. There has been a complete failure to cure this deficiency despite multiple notices. You were notified by the Company's compliance representative that there were multiple paperwork/compliance issues with regards to your annuity business, in the Ohio office on June 4, 2021. The following week, the Company deployed administrative resources to you, the Ohio office, to help train the Ohio office team on how to process client paperwork so that it is aligned with Cambridge's compliance policies of the Company's broker dealer, Cambridge. After several weeks the issues continued, and the Company again deployed resources to visit with you to discuss the still delinquent paperwork issues and attempt to help you resolve them. This occurred the week: of June 15, 2021, whereby Company representatives expounded upon the issues with the Ohio office you were in charge of and instructed the Ohio office to work with Cambridge to resolve the outstanding issues. The issues continued to not be resolved, and Cambridge sent an auditor to the Ohio offices in August 2021 to audit current practices of the Ohio branch. After receipt of the audit findings from Cambridge, you were notified in your meeting with the President of the Company on Tuesday, September 14, 2021, of the multiple audit findings and that your employment was terminated for good cause, and such actions or failure on your part had not been cured and were not cured within ten (10) days thereafter, and therefore such termination was effective September 14, 2021. This is written notice to confirm a majority of the Board of Directors has approved this Notice of Termination.

(ECF No. 54-18, PAGEID # 4119 (reproduced as written).)

### G. Adaptation then hosted webinars with Mr. Eischen's former clients.

After Mr. Eischen's termination, Adaptation hosted a series of webinars with

his former clients under the auspices of an "Introduction to Adaptation." (*See* ECF

Nos. 54-25, 54-27, 54-28.) During the webinars, clients asked questions directly to

Mr. Niemann. During the first such webinar, held on October 26, 2021, Mr.

Niemann responded to a question as follows:

> And then again, as for more detail about what [Mike and Tim] did. Um, again, there was just, when you have to be properly licensed for the products you solicit, so ***one advisor had given up his licenses other than the registered investment advisory standpoint, yet there's correspondence and clear indication and not denied by the rep that they were helping solicit business they weren't licensed for***. Um, ***there was an instance where what the SEC and FINRA calls electronic forgery, which is no different than any other form of forgery where you copy a client's signature, That you have the client sign one page and then you electronically copy it onto multiple pages so that the client doesn't sign it, and again that wasn't denied by the reps.*** Um, the intent though not, the intent wasn't to deceive the client, even though that's why electronic forgery is illegal, because you could do things that the client didn't know, I do not believe that's the case here, I believe this is the case where they were expediting, or attempting to expedite paperwork and make it easier for the client. But that doesn't justify the means, so that just can't go on. And those are just a few samplings of the things that were found during the audit.

(Oct. 26 Webinar Tr., ECF No. 54-26, PAGEID # 4174 (emphasis added).) Similarly,

during the final webinar, Mr. Niemann stated:

> So what were the improprieties regarding fees? Umm there weren't any that I know of that caused for separation of the two advisors that used to be here. ***There were impropriety with business processing, client signatures, things of that nature.*** But I don't believe to my knowledge there is nothing regarding the fees and I don't believe anything that was done prior was intentional. It was a bad choice, a bad

decision by the advisors that put me in a position that they could no longer be associated with the firm. But um, no money is missing, no clients were harmed to the best of my knowledge. And certainly the fees have remained the same. . . .

The events that uh in the reference to the letter that caused the previous advisors not to be affiliated with the firm were not philosophical they were violation of black and white SEC rules and regulations as well as FINRA.

(Nov. 4 Webinar Tr., ECF No. 54-29, PAGEID # 4188, 4192 (emphasis added).)

## II. PROCEDURAL HISTORY

Mr. Eischen first filed suit in the Franklin County Court of Common Pleas.

By the time his case was removed to this Court on December 17, 2021, Mr. Eischen

had filed the operative First Amended Complaint for Damages. He asserts six

claims:

- Count I: Breach of Employment Agreement (Adaptation)
- Count II: Breach of Promissory Note (Adaptation, APN)
- Count III: Fraudulent Inducement (Adaptation)
- Count IV: Defamation (Niemann)
- Count V: False Light (Niemann)
- Count VI: Tortious Interference with Contract (Cambridge)

(Am. Compl.) The Adaptation Group returned with four counterclaims against Mr.

Eischen:

- Counterclaim I: Breach of Contract
- Counterclaim II: Conversion
- Counterclaim III: Misappropriation of Trade Secrets
- Counterclaim IV: Tortious Interference

(Countercl.)

Mr. Eischen, the Adaptation Group, and Cambridge have all filed motions for

summary judgment. (ECF Nos. 53, 54, 55.) Mr. Eischen seeks judgment on Counts

I, II, IV, and V, and Counterclaims I–IV. (ECF No. 54.) The Adaptation Group

10

jointly seeks judgment on Counts I–IV. (ECF No. 53.) And Cambridge seeks judgment on Count VI. (ECF No. 55.) Between the three pending motions, all of the claims and counterclaims are at issue. The Court will address the motions on a claim-by-claim basis, proceeding with Mr. Eischen's claims followed by Adaptation's counterclaims.

## III.   STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *see also Matsushita*

11

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

## IV.    ANALYSIS

### A.    Count One: Breach of Employment Agreement

Mr. Eischen first asserts that Adaptation breached the Employment Agreement by terminating him in a manner that violates its terms and by failing to pay him all compensation owing. Both Mr. Eischen and Adaptation move for summary judgment on Count One.

### 1.    Legal Standard

Under Ohio[2] law, a breach-of-contract claim requires the plaintiff to prove that (i) a contract existed, (ii) the defendant failed without legal excuse to perform when performance was due, and (iii) the plaintiff was damaged by that failure. *Lucarell v. Nationwide Mut. Ins. Co.*, 97 N.E.3d 458, 469 (Ohio 2018). The Court begins by interpreting the relevant contract. "Under Ohio law, the interpretation of written contract terms, including the determination of whether those terms are ambiguous, is a matter of law for initial determination by the court." *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763 (6th Cir. 2008). "[A] contract is 'unambiguous' if a reviewing court 'can give a definite legal meaning' to the contract's terms." *United States v. Ohio*, 787 F.3d 350, 353 (6th Cir. 2015) (quoting *Westfield Ins. Co. v.*

---

[2] This case is before the Court on diversity jurisdiction. *See* 28 U.S.C. § 1332. "[F]ederal courts sitting in diversity apply the substantive law of the forum state and federal procedural law." *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009) (citing, *inter alia*, *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1939)).

*Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003)). Where a contract's terms are not ambiguous, the interpreting court must apply the plain language of the contract. *Savedoff*, 524 F.3d at 763. The court must presume that interpreting the plain language will give rise to the parties' intent. *Id.* Only where a contract is ambiguous may the court look to extrinsic evidence to ascertain the parties' intent. *Id.*; *Ohio*, 787 F.3d at 354.

> ### 2. Adaptation breached the Employment Agreement by terminating Mr. Eischen's employment without notice and/or an opportunity to cure.

Mr. Eischen argues that Adaptation breached the Employment Agreement by terminating him without the required notice and/or opportunity to cure. The Court agrees. The Employment Agreement allows for termination either with or without Good Cause. (Employment Agreement, §§ 8(a)(iii), (iv).) Per its terms, Adaptation could terminate Mr. Eischen without Good Cause on 90-days' written notice. (*Id.*, §§ 8(a)(iii), 13.) Adaptation could alternatively terminate Mr. Eischen for Good Cause "immediately upon providing written notice to [Mr. Eischen], except in the event of a cure period allowed by Section 1." (*Id.*, § 8(a)(iv).) Section 1 defines Good Cause to mean:

> in the reasonable determination of the Board of Directors, any of the following: (i) the commission by [Mr. Eischen] of an act or course of conduct constituting fraud or dishonesty, or actions or failures to act constituting gross negligence or willful neglect of duties by [Mr. Eischen] in the performance of his duties or employment hereunder, if such action or failure is not cured within ten (10) days of written notice from the Board of Directors containing reasonable details concerning the nature of the action or failure; (ii) conviction of, or entry a plea of guilty or nolo contendere to, or agreement to the entry of an order imposing sanctions against [Mr. Eischen] for, any crime involving dishonesty, wrongful taking of property, immoral conduct, bribery, exto1tion, or any felony,

13

or involving fraud or misrepresentation regarding investment advisory services (whether or not involving a sentence of incarceration or fine); (iii) the willful attempt by [Mr. Eischen] to obstruct or fail to cooperate with an investigation authorized by the Board of Directors or governmental agency, if such action or failure is not cured within ten (10) days of written notice from the Board of Directors containing reasonable details concerning the nature of the action or failure; (iv) a finding by a judicial or administrative body of competent jurisdiction that [Mr. Eischen] individually committed a material violation of federal or state law relating to securities; or (v) the entry of any consent, judgment or order barring the [Mr. Eischen] from being associated with any registered or unregistered investment advisor or any securities broker/dealer or any other financial services firm.

(*Id.*, § 1(f).) There is no serious argument that subsections (ii), (iii), (iv), or (v) applied to Mr. Eischen's termination—only subsection (i) applied. (*See* Avery Niemann Dep., ECF No. 51-2, 60:8–63:25.)

Putting these provisions together, the Employment Agreement allowed Adaptation to terminate Mr. Eischen's employment for an act or course of conduct constituting gross negligence or willful neglect of duties (*i.e.*, Good Cause) *if and only if* the Board of Directors provided him with written notice of the circumstances constituting Good Cause and a ten-day opportunity to cure.[3] There is no dispute that Adaptation provided no such cure period. Mr. Niemann verbally terminated Mr. Eischen's employment during an in-person meeting on September 14, 2021. Mr. Niemann cited, generally, the Cambridge audit findings and, specifically, the signature irregularities on Mr. Woodburn's contracts as justification. Mr. Niemann did not offer or allow Mr. Eischen any opportunity to cure the alleged problems— instead, Mr. Eischen was locked out of the business. Then, three weeks later, on

---

[3] Adaptation could alternatively terminate Mr. Eischen's employment for any reason if it provided him with 90-days' written notice.

October 6, 2021, the Board of Directors executed the Notice of Termination, which referred to general compliance deficiencies, failures to complete TDA suitability paperwork, and Cambridge's audit findings as the reasons for terminating Mr. Eischen's employment. The Notice of Termination states:

> [Y]ou were notified in your meeting with the President of the Company on Tuesday, September 14, 2021, of the multiple audit findings and that you employment was terminated for good cause, and such actions or failure on your part had not been cured and were not cured within ten (10) days thereafter, and therefore such termination was effective September 14, 2021.

(Notice of Termination.)

In the face of overwhelming evidence that neither written notice nor any opportunity to cure were provided on September 14, the Notice of Termination, drafted three weeks after-the-fact, fails to create a genuine issue of material fact as to whether the Employment Agreement's termination provisions were complied with. *Accord People10 Techs. Inc. v. Alveo Health LLC*, No. 20-cv-762, 2021 WL 4288360, at *4 (S.D. Ohio Sept. 21, 2021) (Black, J.) (concluding that an email demanding counterclaim defendant to stop work "cannot be said to trigger a cure period," finding instead that "it would seem to foreclose any opportunity to cure").

Adaptation seems to agree, arguing in response that (i) Mr. Eischen failed to perform, thereby excusing Adaptation's breach and (ii) Ohio law excuses failure to comply with notice-and-cure provisions when cure is not possible. (*See* ECF No. 62, PAGEID # 5912–18.) Neither argument is persuasive. As to the first argument, Adaptation conflates Mr. Eischen's performance under the Employment Agreement with its own good cause for terminating the Agreement. (*See* ECF No. 62, PAGEID

# 5913.) Even at oral argument, Adaptation was unable to identify any failure of Mr. Eischen's that was not part-and-parcel the "course of conduct . . . constituting gross negligence or willful neglect of duties" that it relied upon to terminate. In effect, Adaptation asks the Court to interpret the Employment Agreement to permit termination *for* Good Cause without complying with the Good Cause termination procedures *because of* Mr. Eischen's performance failure *constituting* the Good Cause. That interpretation is not only tortured, but would render the Good Cause termination procedures mere surplusage. *Eastham v. Chesapeake Appalachia, L.L.C.*, 754 F.3d 356, 363 (6th Cir. 2014) ("Under Ohio law, 'a contract must be construed . . . in a manner that does not leave any phrase meaningless or surplusage." (quoting *Local Mktg. Corp. v. Prudential Ins. Co.*, 824 N.E.2d 122, 125 (Ohio Ct. App. 2004)). And as to its second argument, Adaptation fails to provide any authority for the proposition that Ohio law excuses notice-and-cure requirements for incurable breaches.[4] Adaptation cites only two cases: the first applies Michigan law, *Dix v. Atos IT Sols. & Servs., Inc.*, No. 1:18-CV-275, 2021 WL 1165762, at *8 (S.D. Ohio Mar. 25, 2021) (Cole, J.) (explaining that, under Michigan law, "[w]hen a breach is 'incurable,' any notice-and-cure provision is inapplicable"); and the second describes the first, *People10*, 2021 WL 4288360, at *5 (citing *Dix* to support the statement that "Michigan courts . . . recognize an exception for 'incurable breaches'").

---

[4] What's more, there is a dearth of evidence that Mr. Eischen's alleged breaches were incurable.

### 3. Genuine issues of material fact prevent summary judgment on whether Adaptation breached the Employment Agreement by failing to pay compensation.

Mr. Eischen also argues that Adaptation breached the Employment Agreement by failing to pay compensation owed under its terms. The unpaid compensation falls under two sections: Severance Payments and Accrued Obligations.

### a) Severance Payments

The Employment Agreement states that Severance Payments are owed following any termination without Good Cause, "provided that [Mr. Eischen] executes a release agreement[.]" (Employment Agreement, § 8(c)(i).) The Agreement continues:

> As a condition to [Mr. Eischen's] receipt of the Severance Payments, [Mr. Eischen] must execute and deliver to [Adaptation], and not subsequently revoke, a full release of all claims that [Mr. Eischen] may have against [Adaptation], its affiliates, and all of their officers, employees, directors, and agents (not including a release of any claims relating to any post-termination payment obligations owed by [Adaptation] to [Mr. Eischen]), in a form acceptable to [Adaptation].

(*Id*.) Mr. Eischen never executed a release of claims (as any observer of this litigation might have guessed). The parties disagree about why that is.

Adaptation sent Mr. Eischen some sort of separation agreement after the September 14, 2021 meeting. (If that agreement is in the record, the parties have failed to bring it to the Court's attention.) Mr. Niemann testified that Mr. Eischen simply "chose not to sign it." (Niemann Dep., 93:21–23.) But Mr. Eischen testified that Adaptation cut-off negotiations when "Alan Niemann found out that [he] had sought counsel." (Eischen Dep., 146:11–22.) Under Ohio law, the "[n]onperformance

of a [contractual] condition is excused where performance thereof is prevented by the other party." *Dynes Corp. v. Seikel, Koly & Co.*, 654 N.E.2d 991, 1005 (Ohio Ct. App. 1994) (citation omitted). *Cf. Lucarell v. Nationwide Mut. Ins. Co.*, 97 N.E.3d 458, 461 (syllabus) (Ohio 2018) ("[A] party who prevents another from performing a contractual obligation may not rely on that failure of performance to assert a claim for breach of contract[.]"). This case presents a genuine issue of material fact as to whether any member of the Adaptation Group prevented Mr. Eischen from performing the condition necessary to receive the Severance Payments.

### b) Accrued Obligations

The Employment Agreement elsewhere provides:

> Upon termination of the Employment Period for any reason, [Adaptation] shall pay [Mr. Eischen] all compensation, as determined under Section 7 that is earned but unpaid as of the Date of Termination, as well as accrued vacation, if any . . . and any unpaid expense reimbursements . . . ("<u>Accrued Obligations</u>").

(*Id.*, § 8(b).) Section 7 describes the components of Mr. Eischen's annual compensation during the Employment Period. Section 7(a) provides:

> Each year during the Employment Period, [Mr. Eischen] shall receive annual compensation in the amount equal to the greater of:
>
> > (i) $80,000, unless [Mr. Eischen] does not receive the $40,000 per year additional compensation contemplated by Section 7(d) [for service on Adaptation's Board of Directors], in which case the Minimum Guaranty would be $120,000 (the "Minimum Guaranty"), and
> >
> > (ii) (A) 50% of gross compensation on commissions and trails (fees) on assets under management resulting from [Mr. Eischen's] team's production that exceeds the previous 12-month period of such team's production[.]

(*Id.*, § 7(a).) Mr. Eischen asserts that he has not been paid any compensation on "commissions and trails." He offers an expert report opining that such compensation totals $562,932. (*See* Smith Report, ECF No. 54-31; *see also* ECF No. 54, PAGEID # 3604.) Adaptation disputes the fact of owed compensation and the amount. In his Supplemental Declaration, Adaptation CFO Kacey Butcher asserts that assets under management fell in the twelve-month period following execution of the Employment Agreement and Mr. Eischen is thus owed nothing under § 7(a)(ii). The question must go to a jury.

Mr. Eischen's Motion for Summary Judgment on Count One is **GRANTED** to the extent such claim is based on Adaptation's breach of the Employment Agreement's termination procedures; it is otherwise **DENIED**. Adaptation's Motion for Summary Judgment on Count One is **DENIED**.

### B. Count Two: Breach of Promissory Note

In Count Two, Mr. Eischen alleges that Adaptation and APN breached the Promissory Note attached to the Asset Purchase Agreement. The Promissory Note required Adaptation and APN to pay $140,000 to EFG on August 27, 2021. To date, no payment has been made. Adaptation and APN argue that payment is not required because the Promissory Note was satisfied by other means when the APA closed. (*See* Butcher Supp. Decl., ECF No. 62-5, ¶¶ 19–20.) But the plain language of the Promissory Note does not contemplate satisfaction by any means except payment on the maturity date. The Court's inquiry ends there.

Mr. Eischen's Motion for Summary Judgment is **GRANTED** as to Count Two; Adaptation's is **DENIED**.

## C.    Count Three: Fraudulent Inducement

In Count Three, Mr. Eischen alleges that Adaptation fraudulently induced

him to sign the Amended and Restated Shareholders Agreement when Mr. Butcher

represented that the agreement reflected "absolutely no changes" to his rights as a

shareholder. (Eischen Dep., ECF No. 51-1, 126:17–22.) Mr. Eischen "assum[ed]"

that Mr. Butcher was "telling . . . the truth" and signed the Agreement "without

reading one word of" it. (*Id.*, 126:25–127:5.) He later learned that the Amended and

Restated Shareholder Agreement does not contain the same redemption rights for

terminated shareholders as the agreement it superseded. (*Compare* Class B

Stockholders Agreement dated August 27, 2020, § 3.06(a), PAGEID # 3235–36 ("As

soon as practicable upon the termination of employment of a Stockholder . . . , the

Company shall purchase all (but not less than all) of the Class B Common Stock

owned by the Terminating Shareholder at the effective date of termination[.]") *with*

Amended and Restated Shareholders Agreement dated August 6, 2021, § 4.01(b),

PAGEID # 3513–14 ("If any Shareholder . . . wishes to sell, assign, transfer or

otherwise dispose of any or all Shares owned by such Shareholder, then the Selling

Shareholder must following the procedures [giving the Company and other

shareholders a right of first refusal] set forth in this Section 4.01 before effecting

such sale.").)

Under Ohio law, the elements of fraud are:

(1) a representation . . . (2) that is material to the transaction at hand,
(3) made falsely, with knowledge of its falsity or with such utter
disregard and recklessness as to whether it is true or false that
knowledge may be inferred, and (4) with intent to mislead another into

relying upon it, (5) justifiable reliance, and (6) resulting injury proximately caused by the reliance.

*Volbers-Klarich v. Middletown Mgmt., Inc.*, 929 N.E.2d 434, 440 (Ohio 2010) (citation omitted). Fraud in the inducement relates to the facts surrounding an agreement's execution, rather than the nature or purpose of the agreement itself. *Haller v. Borror Corp.*, 552 N.E.2d 207, 210 (Ohio 1990).

> The Ohio Supreme Court has held that
>
> [a] person of ordinary mind cannot say that he was misled into signing a paper which was different from what he intended to sign when he could have known the truth by merely looking when he signed. * * * If a person can read and is not prevented from reading what he signs, he alone is responsible for his omission to read what he signs.

*Id.* (quoting *Dice v. Akron, C. & Y. R. Co.*, 87 N.E.2d 301, 304 (Ohio 1951), *rev'd on other grounds*, 342 U.S. 359 (1952)). That is the scenario here. Mr. Eischen concedes in testimony that he "could have" told Mr. Butcher he needed to take time to review the document before signing it. (Eischen Dep., 128:15.) Yet he "did not read one word before signing." (*Id.*, 128:12.) "It will not do for a man to enter into a contract and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained. If this were permitted, contracts would not be worth the paper on which they are written." *ABM Farms, Inc. v. Wood*, 692 N.E.2d 574, 579 (Ohio 1998) (quotation and citation omitted).

Adaptation's Motion for Summary Judgment is **GRANTED** as to Count Three.

### D. Count Four: Defamation

In Count Four, Mr. Eischen alleges that Mr. Niemann defamed him during the October 26 and November 4 Town Halls. In particular, he points at (i) the statement that Mr. Eischen sold securities for which he was not licensed and (ii) the statements implying that Mr. Eischen was involved in the "signature irregularities." Mr. Eischen and Mr. Niemann both move for summary judgment.

### 1. Legal Standards

To succeed on an Ohio defamation claim, Mr. Eischen must show

(1) that a false statement of fact was made, (2) that the statement was defamatory, (3) that the statement was published, (4) that the plaintiff suffered injury as a proximate result of the publication, and (5) that the defendant acted with the requisite degree of fault in publishing the statement.

*Croce v. New York Times Co.*, 345 F. Supp. 3d 961, 973–74 (S.D. Ohio 2018) (Graham, J.), *aff'd*, 930 F.3d 787 (6th Cir. 2019) (quoting *Am. Chem. Soc. v. Leadscope, Inc.*, 978 N.E.2d 832, 852 (2012)). Mr. Niemann does not dispute that the statements were defamatory, that they were published, or that Mr. Eischen suffered injury. Instead, he argues that the statements were truthful and were made subject to qualified privilege.

*Truthfulness*. "In Ohio, truth is a complete defense to a claim for defamation." *Ed Schory & Sons, Inc. v. Soc. Nat'l Bank*, 662 N.E.2d 1074, 1083. Ohio courts define a "false statement" as

a statement that sets forth matters which are not true or statements without grounds in truth or fact. A statement is not a 'false statement' if, even though it is misleading and fails to disclose all relevant facts, the statement has some truth in it. Moreover, a statement that is subject to different interpretations is not 'false.'

*Serv. Emp. Int'l Union Dist. 1199 v. Ohio Elections Comm.*, N.E.2d 424, 430 (Ohio Ct. App. 2004) (internal quotations and citations omitted) (cleaned up). The Sixth Circuit acknowledges that Ohio has a "low threshold . . . for a finding of 'truth.'" *Susan B. Anthony List v. Driehaus*, 779 F.3d 628, 633 (6th Cir. 2015). As this Court has explained, "[a]ll that's needed is either ambiguity, some truth, or 'that the "gist" or "sting" of the statement is substantially true.' The Court looks past even 'minor inaccuracies' to find the 'gist.'" *Croce*, 345 F. Supp. 3d at 983 (quoting *Susan B. Anthony List*, 779 F.3d at 633; *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991)).

*Qualified Privilege*. Ohio recognizes a qualified privilege defense to defamation where "society's interest in compensating a person for loss of reputation is outweighed by a competing interest that demands protection." *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 651 N.E.2d 1283, 1290 (Ohio 1995). A defendant asserting the privilege must show (i) good faith, (ii) an interest to be upheld, (iii) a statement limited in scope to this purpose, (iv) a proper occasion, and (v) publication in a proper manner and to proper parties only. *Jackson v. Columbus*, 883 N.E.2d 1060, 1064 (Ohio 2008) (citation omitted). "[T]he privilege does not attach to the communication, but to the occasion on which it is made." *A & B-Abell*, 651 N.E.2d at 1290. It is qualified, though—not absolute. Invoking the privilege "does not change the actionable quality of the publication[;]" it only "heightens the required degree of fault" to actual malice. *Id.*; *see also Jackson*, 883 N.E.2d at 1064 ("A qualified privilege may be defeated only if a

claimant proves with convincing clarity that a published acted with actual malice.").
The Ohio Supreme Court has defined "actual malice" as "acting with knowledge
that the statements are false or acting with reckless disregard as to their truth or
falsity." *Jackson*, 883 N.E.2d at 1064.

> **2.** **Mr. Niemann is entitled to summary judgment on his statements implicating Mr. Eischen in the signature irregularities.**

<div style="border:1px solid">

### October 26 Town Hall

*[T]here was an instance where what the SEC and FINRA calls electronic forgery, which is no different than any other form of forgery where you copy a client's signature, That you have the client sign one page and then you electronically copy it onto multiple pages so that the client doesn't sign it, and again that wasn't denied by the reps.*

### November 4 Town Hall

*[T]here weren't any [improprieties regarding fees] that I know of that caused for separation of the two advisors that used to be here. There were impropriety with business processing, client signatures, things of that nature.*

</div>

Mr. Eischen first argues that Mr. Niemann "falsely accused [him] of
committing 'electronic forgery,' and behaving improperly with respect to 'client
signatures.'" (ECF No. 54, PAGEID # 3608.) Mr. Niemann responds that his
statements were truthful because Messrs. Eischen and Woodburn "worked the book
as a team[.]" (Eischen Dep., 86:15–20.) The Court agrees, though not for the reason
Mr. Niemann puts forward. As noted, Ohio law sets a "low threshold" for a finding
of truth. Ohio courts look to the plain and literal language of the statement at issue
to determine truth or falsity. *See Krems v. Univ. Hosp. of Cleveland*, 726 N.E.2d

1016, 1020 (Ohio Ct. App. 1999). Here, the Town Hall transcripts reveal that Mr. Niemann *did not* accuse Mr. Eischen of engaging in forgery. Mr. Niemann represented on the October 26 Town Hall that there was "an instance" of electronic forgery, and that no one denied that it happened. That is true. Similarly, during the November 4 Town Hall, Mr. Niemann represented that "impropriety with business processing [and] client signatures" contributed to Mr. Eischen and Mr. Woodburn's departures. Again, that is true. Mr. Eischen's real complaint is that the statements *imply* that he (as opposed to Mr. Woodburn) mishandled signatures. But mere implication cannot support a defamation claim under Ohio law. *Id.* at 1021 ("Ohio does not recognize libel through implied statements.").

> ### 3.   A jury must decide whether Mr. Niemann acted under qualified privilege when he said that Mr. Eischen acted outside of his license.

<div style="border:1px solid">

#### October 26 Town Hall

*[O]ne advisor had given up his licenses other than the registered investment advisory standpoint, yet there's correspondence and clear indication and not denied by the rep that they were helping solicit business they weren't licensed for.*

</div>

Mr. Eischen next argues that Mr. Niemann falsely accused him of engaging in unlicensed business on the October 26 Town Hall. Mr. Niemann once again defends the statement as true. Looking at its plain language, the gist of this statement is not that Mr. Eischen acted outside the scope of his role as an IAR—it is that Adaptation *had evidence indicating* that he did. Ms. Chabin's December 2021 notes reflect that Cambridge exchanged emails "with an insurance company issuer

of annuities [in which it was] suggested that Eischen was directly involved in the sale of annuities[.]" (Paulukaitis Report, ECF No. 54-8, PAGEID # 3869.) Mr. Paulukaitis (Adaptation's securities expert) characterized these emails as one of the "concerns Cambridge had . . . relating to Eischen's office." (*Id.*, PAGEID # 3868.) But Ms. Roth (Mr. Eischen's securities expert) opined that Mr. Eischen's annuities practices were in-bounds. (Roth Report, PAGEID # 3845, 3854.) Although it is not clear whether Ms. Roth had access to the emails referenced in Ms. Chabin's notes, Ms. Roth testified that she did not see anything suggesting that Cambridge so much as accused Mr. Eischen of "improperly participating in the sale of variable annuities[.]" (Roth Dep., ECF No. 56-5, 72:13–17.) There is thus a question of fact as to whether Mr. Niemann's statement was true—that is, whether Adaptation had documents indicating that Mr. Eischen acted outside the scope of his role.

Mr. Niemann further asserts that his Town Hall statements are privileged. Mr. Eischen disputes the assertion, arguing that Mr. Niemann has not proved that his statements were properly limited in scope to the purpose of the privileged occasion. (*See* ECF No. 59, PAGEID # 4982.) The Court agrees. In Mr. Niemann's view, "any good faith statement" made in a privileged circumstance "is protected by that privilege[.]" (ECF No. 63, PAGEID # 7829 (citing *A & B Abell*, 651 N.E.2d at 1290).) He overreads the relevant law. Mr. Niemann presented the Town Hall for a legitimate purpose—to explain abrupt and significant personnel changes at the listeners' financial advisor's office. During the September 14 meeting, Mr. Niemann represented to Mr. Eischen that his employment was terminated due to the

signature irregularities. And in the October 6 Notice of Termination, the Adaptation Board represented to Mr. Eischen that his employment was terminated due to the failure to complete TDA suitability paperwork. But at no point was Mr. Eischen advised that his termination was the result of "correspondence and clear indication . . . that [he was] helping solicit business [he wasn't] licensed for." Because reasonable minds could find that the statement was outside the scope of the privileged purpose, the question must be posed to a jury. *See Hartman v. Kerch*, 217 N.E.3d 881, 905–06 (Ohio Ct. App. 2023).

Adaptation's Motion for Summary Judgment as to Count Four is **GRANTED** to the extent Count Four is based on statements about signature irregularities and **DENIED** to the extent based on statements about conducting unlicensed business. Mr. Eischen's Motion for Summary Judgment as to Count Four is **DENIED** in total.

### E.  Count Five: False Light

In Count Five, Mr. Eischen asserts a claim for false-light invasion of privacy. The claim was only recently recognized as a viable cause of action in Ohio. *See Welling v. Weinfeld*, 866 N.E.2d 1051 (Ohio 2007). It is closely related to defamation, but distinct. *Id.* at 1058 (explaining that, although false-light and defamation may be "alternative or additional" claims, a plaintiff "can have but one recovery for a single instance of publicity").

> In Ohio, one who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

27

*Croce*, 345 F. Supp. 3d at 993 (quoting *Welling*, 866 N.E.2d at 1059). Mr. Eischen's false-light claim is made only as to the Town Hall statements pertaining to signature irregularities. (*See* ECF No. 54, PAGEID # 3610–13; ECF No. 59, PAGEID # 4979–81.) The Court has already concluded that those statements are not false. Count Five thus fails.

The Adaptation Group's Motion for Summary Judgment as to Count Five is **GRANTED**; Mr. Eischen's is **DENIED**.

### F.    Count Six: Tortious Interference with Contract

In Count Six, Mr. Eischen alleges that Cambridge tortiously interfered with his contractual relationship with Adaptation when it (i) presented inaccurate and inappropriate audit findings to Adaptation and (ii) issued an ultimatum demanding Mr. Eischen's termination. Under Ohio law, tortious interference with contract requires:

> (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages.

*Fred Siegel Co., L.P.A. v. Arter & Hadden*, 707 N.E.2d 853, 855 (syllabus) (Ohio 1999). Cambridge asserts that Mr. Eischen's claim fails on the third and fourth elements. The Court agrees.

Before summarizing the parties' arguments, it is helpful to address the obvious factual disputes implicated in Count Six. First, were Cambridge's audit findings inaccurate? And second, did Cambridge issue an ultimatum forcing Adaptation to choose between its relationship with Cambridge and its relationship with Messrs. Eischen and Woodburn? Mr. Eischen argues that these are genuine

issues of material fact precluding summary judgment. But even assuming that these disputes resolved in Mr. Eischen's favor (that the audit *did* contain inaccurate findings and that Ms. Chabin *did* deliver Cambridge's ultimatum), he still fails to establish that Cambridge "intentionally and improperly interfere[d] with the performance of" the Employment Agreement. *Id.* at 858 (quoting Restatement (Second) of Torts § 766 (Am. L. Inst. 1979)).

The third element of his claim requires Mr. Eischen to show that Cambridge intentionally procured a breach of the Employment Agreement—that is, that Cambridge either "acted with the purpose or desire to interfere with the performance of the" Employment Agreement or "knew that interference was certain or substantially certain to occur as a result of its actions." *Ginn v. Stonecreek Dental Care*, 30 N.E.3d 1034, 1041 (Ohio Ct. App. 2015) (citation omitted); *see also* Restatement (Second) of Torts § 766 cmt. j (Am. L. Inst. 1979). Cambridge argues that Mr. Eischen failed to present evidence that it intended for Adaptation to <u>breach</u> the Employment Agreement. In its view, the evidence (taken in the light most favorable to Mr. Eischen) merely shows that Cambridge induced Adaptation to <u>*terminate*</u> the Employment Agreement—which the Agreement allows for, provided that notice is given and compensation owing is paid. Cambridge notes that there is no evidence that the alleged ultimatum touched on the termination's timing, notice-and-cure provisos, or accompanying payments.

The comments to the Restatement are a helpful reference. Comment *l* is particularly apt:

A refusal to deal is one means by which a person may induce another to commit a breach of his contract with a third person. Thus A may induce B to break his contract with C by threatening not to enter into, or to sever, business relations with B unless B does break the contract. This situation frequently presents a nice question of fact. While, under the rule stated in this Section, A may not, without some justification induce B to break his contract with C, A is ordinarily free to refuse to deal with B for any reason or no reason. The difficult question of fact presented in this situation is whether A is merely exercising his freedom to select the persons with whom he will do business or is inducing B not to perform his contract with C. That freedom is not restricted by the relationship between B and C; and A's aversion to C is as legitimate a reason for his refusal to deal with B as his aversion to B. If he is merely exercising that freedom, he is not liable to C for the harm caused by B's choice not to lose A's business for the sake of getting C's.

On the other hand, if A, instead of merely refusing to deal with B and leaving B to make his own decision on what to do about it, goes further and uses his own refusal to deal or the threat of it as a means of affirmative inducement, compulsion or pressure to make B break his contract with C, he may be acting improperly and subject to liability under the rule stated in this Section.

Restatement (Second) of Torts § 766 cmt. *l* (Am. L. Inst. 1979). Thus, the Restatement makes clear that refusal to deal is a permissible expression of one's freedom-of-contract *provided that* it does not induce the breach of an existing agreement or prevent its performance.

Mr. Eischen's principal evidence that Cambridge interfered with the Employment Agreement is that Cambridge threatened refusal to deal to "induc[e], comp[el], or pressure" Adaptation to terminate his employment. But termination does not equal breach. Even if it did issue an ultimatum, nothing suggests that Cambridge decided the terms on which Mr. Eischen's employment ended—*i.e.*, immediately and with no severance. (*See* Butcher Dep., 74:2–11 ("Ms. Chabin said that . . . she was okay with Mr. Eischen retiring. He could stay on for a couple of

months but he would not have access to any client data and they wouldn't allow him access to clients or the client data in the office. Tim had to go immediately because of the forgery and the signatures.").)

Mr. Eischen also argues that Cambridge interfered with the Employment Agreement by presenting inaccurate audit findings to Adaptation. Even if this theory were to survive element three, it fails element four. Under the fourth element of a tortious interference with contract claim, courts endeavor to determine whether the alleged interference was improper. The Ohio Supreme Court uses a seven-factor balancing test for that purpose:

> in determining whether an actor has acted improperly in intentionally interfering with a contract . . . , consideration should be given to the following factors: (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.

*Fred Siegel Co., L.P.A.*, 707 N.E.2d at 860. "The nature of the actor's conduct is the chief factor, but the test is a balancing test." *Union of Needletrades, Indus. and Textile Emps. AFL-CIO v. Am. Capital Strategies, Ltd.*, 546 F. Supp. 2d 546, 562 (S.D. Ohio 2008) (Holschuh, J.).

Mr. Eischen discusses only two the *Fred Siegel* factors (*see* ECF No. 60, PAGEID # 5592–94), which is problematic given that "Ohio courts place the burden on the plaintiff to show that the defendant's conduct was" improper. *Havensure, L.L.C. v. Prudential Ins. Co. of Am.*, 595 F.3d 312, 316 (6th Cir. 2010). The Court nevertheless finds that each factor falls in Cambridge's favor.

_Factor (a)_. As to the nature of Cambridge's conduct, "no one disputes that Cambridge was authorized to audit Adaptation." (ECF No. 60, PAGEID # 5592.) Mr. Eischen argues that Cambridge's audit report inappropriately held him to the standards applicable to an RR and incorrectly categorized his personal investments as private securities transactions. While the auditor may have made mistakes in his report, there is no evidence that any errors were intentional; the Court sees no reason why they would render Cambridge's presentation of the audit findings improper. This factor weighs in favor of Cambridge.

_Factor (b)_. Moving next to Cambridge's motive, Mr. Eischen suggests that Cambridge was looking for an easy way out of its relationship with Adaptation. While the Court agrees that a "question of Cambridge's motive is not properly resolved on summary judgment," (_id._, PAGEID # 5594), the evidence reveals no genuine question on the issue. Mr. Eischen's suggestion as to Cambridge's motive is pure speculation. Nothing in the record tends to indicate that Cambridge had any motive other than executing its compliance obligations. This factor also weighs in favor of Cambridge.

_Factors (c), (d), (e), and (g)_. The interests of the three parties is, by now, well understood. Cambridge and Adaptation were BD-RIA under the IRIA Relationship Agreement; Adaptation and Mr. Eischen were employer-employee under the Employment Agreement; Mr. Eischen was also a shareholder and director of Adaptation. All three were subject to regulation by either FINRA or the SEC, and all three understood the heavy regulatory burden on Cambridge. All three also

agree that regulatory compliance protects an IAR/RR's customers. These factors weigh in favor of Cambridge.

*Factor (f)*. Finally, while Cambridge's presentation of the audit findings to Adaptation is relatively proximate to his termination, it is not so proximate to the alleged breach of the Employment Agreement. Mr. Niemann represents that the results of Cambridge's audit drove his decision to terminate Mr. Eischen's employment. But, as discussed at length above, the termination is not the breach; it is how the termination was accomplished. This factor weighs in favor of Cambridge.

Cambridge's Motion for Summary Judgment is **GRANTED** as to Count Six.

### G.    Counterclaim One: Breach of Contract

In its first Counterclaim, Adaptation alleges that Mr. Eischen breached the Employment Agreement when he:

1) "did not report all revenue earned [through the sale of insurance] due to his Employment Agreement activities[;]"

2) "partook in the sale of securities without a license to sell those securities in violation of the Employment Agreement[;]"

3) "failed to properly manage his investment team[;]" and

4) "breached his Restrictive Covenants set forth in the Employment Agreement."

(Countercl., ¶¶ 64–67.) Mr. Eischen moves for summary judgment, arguing that the evidence establishes that: he disclosed his insurance brokerage business to Adaptation; he did not sell securities he was not licensed to sell, and that the three transactions identified on the Cambridge audit report were later determined not to be Private Securities Transactions; he was not permitted to exercise supervisory

authority over IARs or RRs, and that doing so was Adaptation's responsibility; and the Employment Agreement's non-competition provision is unenforceable but was nevertheless complied with. (ECF No. 54, PAGEID # 3614.)

Adaptation's response is not a model of clarity. On Counterclaim One in particular, it is a recitation of facts with little effort to connect those facts to the claim or explain their significance under the law. (*See* ECF No. 62, PAGEID # 5927–31.) But some preliminary conclusions may be drawn. Initially, by failing to respond to Mr. Eischen's raising the issue, Adaptation forfeits any argument that he breached the Employment Agreement by engaging in insurance brokerage activities or private securities transactions. *Cf. Bannister v. Knox Cnty. Bd. of Educ.*, 49 F.4th 1000, 1012 (6th Cir. 2022) ("To overturn a district court's decision based on a theory that a litigant did not present would compel the district court to 'invent' theories for the litigant, something that the Supreme Court generally discourages."); Fed. R. Civ. P. 56(c)(1), (e). Further, though it is true that Cambridge's audit of the office headed by Mr. Eischen resulted in multiple deficiency findings, Adaptation does not explain why Mr. Eischen should be held accountable under contract for supervisory duties that he was not authorized by FINRA or the SEC to perform.

Instead, Adaptation focuses on the fourth alleged breach, arguing that Mr. Eischen breached Sections 9 (Ownership and Disclosure of Information and Company Property), 10 (Nondisclosure), and 11 (Restrictive Covenants) when he retained the contact information for his former clients, and exchanged text

messages and emails with them, after his employment was terminated. (*See* ECF

No. 62, PAGEID # 5929.)

> *Sections 9 and 10*. Section 9(d) of the Employment Agreement provides:

> At the end of the Employment Period, . . . [Mr. Eischen] will deliver to [Adaptation] any and all [Adaptation]-related property, including, without limitation, files, drawings, notes, memoranda, specifications, devices, formulas, and documents, together with all paper and electronic copies thereof, and any other material containing or disclosing any Confidential Information. [Mr. Eischen] further agrees that any property situated on [Adaptation's] premises and owned by the [Adaptation], including communication devices, computers, disks, other storage media, filing cabinets, and other work areas, is subject to inspection by [Adaptation] personnel at any time, with or without notice.

Section 10(a) similarly provides:

> . . . [Mr. Eischen] hereby agrees that he will not copy, or remove from premises authorized by [Adaptation], any Confidential Information or other material related to the operations of [Adaptation] or its affiliates, or their clients or customers and all such items shall remain at all times the sole property of [Adaptation] or its affiliates or such clients or customers. . . . [Mr. Eischen] agrees that he shall not use, either directly or indirectly, at any time, any Confidential Information other than in furtherance of the interests of the Company or its affiliates. . . . Upon termination of his employment, [Mr. Eischen] will promptly deliver to [Adaptation] all tangible materials and objects containing Information (including all copies thereof, whether prepared by [Mr. Eischen] or others) which he may possess or have under his control, and all Confidential Information in computer memory, regardless of format, shall be erased and [Mr. Eischen] shall certify such erasure to [Adaptation] in writing.

> Mr. Eischen assumes for purposes of his Motion that the client contact

information is Confidential Information subject to the Employment Agreement.

(ECF No. 54, PAGEID # 3620.) But he does not offer any argument that Sections

9(d) or 10(a) are ambiguous or unenforceable, or that his treatment of the client

contact information does not constitute a breach. (*See* ECF Nos. 54, 65.)

*Section 11*. Section 11 is different from the prior two sections, in nature and under law. It provides, in relevant part:

(a) [Mr. Eischen] covenants and agrees that he will not, directly or indirectly, either on his own behalf or on behalf of another, do or cause to be done or participate in any of the following acts:

(i) During the Employment Period and during the period ending on the date that is twenty four (24) months after the Employment Period ends for any reason, solicit, entice, induce, or in any way conduct business competitive with [Adaptation's] Business with any client or customer of [Adaptation] or its affiliates with whom [Mr. Eischen] had direct contact during his employment with [Adaptation] to become a client or customer of any other person, firm or corporation with respect to services provided by [Adaptation] or its affiliates as of the end of the Employment Period or to cease doing business with [Adaptation], and [Mr. Eischen] shall not communicate with any such person, firm, or corporation for such purpose or authorize or knowingly approve the taking of such actions by any other person;

. . .

(iii) During the Employment Period and during the period ending on the date that is twelve (12) months after the Employment Period ends for any reason, Accept or maintain employment with, perform services for, consult, engage in, prepare to engage in, assist, invest, advise, or be directly or indirectly involved in the management, operation, or control of any business or venture (other than [Adaptation]) which is in competition with [Adaptation] Business anywhere in the counties in which [Adaptation] or its affiliates engage in the Company Business during the Employment Period and in which [Mr. Eischen] performed personal services on behalf of [Adaptation] during the Employment Period.

Mr. Eischen argues that these provisions are an unreasonable restraint on trade and are thus unenforceable under Ohio law. (ECF No. 54, PAGEID # 3619–24.) He appropriately cites *Raimonde v. Van Vlerah*, in which the Ohio Supreme Court held that reasonable non-compete agreements are valid and enforceable, and

36

_un_reasonable non-competes are enforceable only "to the extent necessary to protect an employer's legitimate interests." 325 N.E.2d 544, 544–45 (syllabus) (1975). A non-compete is "reasonable" if the restraint "[(i)] is no greater than is required for the protection of the employer, [(ii)] does not impose undue hardship on the employee, and [(iii)] is not injurious to the public." _Id._ at 545 (syllabus). Under Ohio law, there are nine additional factors used to determine reasonableness:

> the absence or presence of limitations as to time and space; whether the employee represents the sole contact with the customer; whether the employee is possessed with confidential information or trade secrets; whether the covenant seeks to eliminate competition which would be unfair to the employer or merely seeks to eliminate ordinary competition; whether the covenant seeks to stifle the inherent skill and experience of the employee; whether the benefit to the employer is disproportional to the detriment to the employee; whether the covenant operates as a bar to the employee's sole means of support; whether the employee's talent which the employer seeks to suppress was actually developed during the period of employment; and whether the forbidden employment is merely incidental to the main employment.

_Id._ at 547 (quotation and citation omitted) (cleaned up). The employer bears the burden of proving the reasonableness of the restraint. _Chicago Title Ins. Corp. v. Magnuson_, 487 F.3d 985, 991 (6th Cir. 2007).

Mr. Eischen argues that seven of the nine _Raimonde_ factors weigh in his favor. (ECF No. 54, PAGEID # 3621–23.) Adaptation does not defend the provision (_see_ ECF No. 62, _generally_), and the Court declines to invent theories on its behalf. As a consequence, Adaptation fails to carry its burden of proving that the restraint in Section 11 is no greater than required for its protection, does not impose under hardship on Mr. Eischen, and is not injurious to the public.

Mr. Eischen's Motion for Summary Judgment is **DENIED** as to the alleged breaches of Employment Agreement §§ 9(d) and 10(a); it is otherwise **GRANTED**.

## H. Counterclaim Three: Trade Secrets

In Counterclaim Three, Adaptation alleges that Mr. Eischen misappropriated its trade secrets in violation of the Ohio Uniform Trade Secrets Act ("OUTSA"), Ohio Rev. Code § 1333.61, *et seq*., when he contacted former clients after Adaptation terminated his employment.[5] Mr. Eischen assumes for purposes of his Motion that Adaptation's customer contact information is a trade secret. (ECF No. 54, PAGEID # 3626.) He argues only that the evidence fails to show that he "misappropriated" the client contact information in violation of the statute.

The OUTSA defines "misappropriation" to include the disclosure or use of another's trade secret without that person's consent if knowledge of the trade secret was acquired by "improper means" or "derived from or through a person who owed a duty . . . to maintain its secrecy or limit its use." Ohio Rev. Code § 1333.61(B)(2). The thrust of Mr. Eischen's argument is that he did not use or disclose his former clients' contact information in any way that caused Adaptation harm. But the OUTSA does not define "misappropriation" in terms of the *effect* of unauthorized use, rather by the *fact* of it. *See id*.

---

[5] Mr. Eischen identifies (i) business development information and (ii) client contact information as the two possible "trade secrets" underlying Adaptation's claim. (ECF No. 54, PAGEID # 3626.) Because Adaptation does not mention the business development information (*see* ECF No. 62, *generally*), it waives any argument that such information forms the basis of its claim.

Mr. Eischen's Motion for Summary Judgment is **DENIED** as to Counterclaim One.

## I.     Counterclaim Two: Conversion; Counterclaim Four: Tortious Interference

Adaptation asserts in Counterclaims Two and Four, respectively, that Mr. Eischen committed conversion and tortious interference with its business interests. Mr. Eischen argues that these claims are preempted by state law. The Court agrees.

The OUTSA preempts conflicting "tort, restitutionary, and other laws" that provide "civil remedies for misappropriation of a trade secret." Ohio Rev. Code § 1333.67(A). While the "Ohio Supreme Court has yet to speak to the scope of the OUTSA's preemption clause" (*Stolle Mach. Co., LLC v. RAM Precision Industries*, 605 F. App'x 473, 484 (6th Cir. 2015) (quotation omitted); *see also Hanneman Family Funeral Home & Crematorium v. Orians*, No. 2022-0573, — N.E.3d —, 2023 WL 6626674, at *4 (Ohio Oct. 12, 2023) (declining to address whether the OUTSA "preempts all claims based on the unauthorized use of information, even when the information is not a trade secret as defined by the" OUTSA, while holding that the statute "prevents a plaintiff from merely restating their trade secret claims as separate tort claims") (quotation and citations omitted), the Sixth Circuit broadly applies OUTSA preemption, finding the statute "should be understood to preempt not only causes of action for misappropriation of trade secrets but also causes of action that are based in some way on misappropriation of trade secrets." *Stolle*, 605 F. App'x at 485; *Campfield v. Safelite Grp., Inc.*, 91 F.4th 401, 414 (6th Cir. 2024). Under this standard, a claim will be preempted if it is "no more than a restatement

of the same operative facts that form[ ] the basis of the plaintiff's statutory claim for trade secret misappropriation." *Stolle*, 605 F. App'x at 485 (quoting *Thermodyn Corp. v. 3M Co.*, 593 F. Supp. 2d 972, 989 (N.D. Ohio 2008)) (cleaned up). *Cf. Hanneman Family Funeral Home*, 2023 WL 6626674, at *4 ("[T]he key inquiry is whether the same factual allegations of misappropriation are being used to obtain relief outside the [OUTSA].") (internal quotation and citation omitted). A claim will survive preemption to the extent it has an "independent factual basis." *Stolle*, 605 F. App'x at 485 (quoting *Miami Valley Mobile Health Servs., Inc. v. ExamOne Worldwide, Inc.*, 852 F. Supp. 2d 925, 940 (S.D. Ohio 2012) (Rice, J.)).

Adaptation's conversion and tortious interference claims are based on the same operative facts as its trade secrets claim. The fundamental assertion in each is that Mr. Eischen gained access to Adaptation's client contact information (the alleged trade secret) and, after his termination, kept and used that information to Adaptation's detriment. (*See* ECF No. 62, PAGEID # 5935–37.) Because Adaptation does not identify an independent factual basis for its conversion or tortious interference claims, they are preempted by OUTSA.

Mr. Eischen's Motion for Summary Judgment is **GRANTED** as to Counterclaims Two and Four.

## V. CONCLUSION

For the reasons above, Mr. Eischen's Motion for Summary Judgment (ECF No. 54) is **GRANTED in part** and **DENIED in part**; Adaptation's Motion for Summary Judgment (ECF No. 53) is **GRANTED in part** and **DENIED in part**; and Cambridge's Motion for Summary Judgment (ECF No. 55) is **GRANTED**.

Adaptation's duplicative Motion for Summary Judgment (ECF No. 52) is **DENIED as moot**. The following issues remain for trial, which will be set in a separate order:

Count I: Breach of Employment Agreement

      Breach of termination provisions: Damages

      Failure to pay compensation: Liability and damages

Count II: Breach of Promissory Note

      Damages only

Count IV: Defamation

      Statements about unlicensed business: Liability and damages

Counterclaim I: Breach of Employment Agreement

      Breach of §§ 9(d), 10(a): Liability and damages

Counterclaim III: Misappropriation of Trade Secrets

      Liability and damages

**IT IS SO ORDERED.**

                /s/ Sarah D. Morrison
                **SARAH D. MORRISON**
                **UNITED STATES DISTRICT JUDGE**